```
              IN THE UNITED STATES DISTRICT COURT
           FOR THE EASTERN DISTRICT OF PENNSYLVANIA


                            - - -

EDUARDO ROSARIO,            :  CIVIL NO. 20-2966
                            :
              Plaintiff     :
                            :
                            :
                            :
                            :
                            :
      v.                    :
                            :
                            :
                            :
                            :
                            :
                            :
ALEX TORRES PRODUCTIONS,    :  Philadelphia, Pennsylvania
INC., et al.,               :  November 10, 2021
              Defendant     :  2:07 p.m.


                            - - -

             TRANSCRIPT OF SHOW CAUSE HEARING
          BEFORE THE HONORABLE EDUARDO C. ROBRENO
            UNITED STATES DISTRICT COURT JUDGE


                            - - -

APPEARANCES:

For the Plaintiff:   KEITH ALTMAN, ESQUIRE
                     JOAN A. FEINSTEIN, ESQUIRE
                     Lento Law Group, P.C.
                     1500 Market Street
                     12th Floor
                     East Tower
                     Philadelphia, PA 19102


For the Defendant:   JOHN J. GRIFFIN, ESQUIRE
                     Law Office of John J. Griffin
                     P.O. Box 571
                     Lafayette Hill, PA 19444
```

2

1    Audio Operator:        Carl Hauger

2    Transcribed By:        Michael T. Keating

3                              - - -

4          Proceedings recorded by electronic sound
     recording; transcript produced by computer-aided
5    transcription service.

6                              - - -

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (The following was heard in open court at

2      2:07 p.m.)

3              THE COURT:  Good afternoon.  Please be

4      seated.

5              MR. ALTMAN:  Thank you.

6              (Pause in proceedings.)

7              THE COURT:  You may remove your mask when

8      you're speaking to the Court.  So today is a hearing

9      on a rule to show cause on why plaintiff's counsel,

10     Keith Altman and Joan Feinstein, both present in the

11     court I take it, should not be sanctioned for their

12     failure to accurately certify that there were no

13     related cases in violation of Pennsylvania Rule of

14     Professional Conduct 3.3A; and two, failure to

15     provide authority in the complaint regarding

16     promoter's ability, as ordered by the Court on

17     January 13th, 2020.

18             Additionally, the Court had raised issues

19     concerning the viability of the Lento Law Firm in

20     Philadelphia given that the pro hac vice form, which

21     was filed by the law firm, listed the address of that

22     law firm as Farmington Hills, Michigan.

23             The Court's order to show cause also

24     provided that a response to the rule was to be filed

25     by October 25th of 2021.  As of this morning, no

4

1   response has been filed.  So that's where we are.

2   So, Ms. Feinstein or Mr. Altman, would you like to

3   address those issues?

4           MR. ALTMAN:  I would, Your Honor, and I

5   have a severe visual disability.  Would it be okay if

6   I argued seated?

7           THE COURT:  Absolutely, you may do so.

8           MR. ALTMAN:  Thank you, Your Honor.  Your

9   Honor, let me address the filing issue.  We've had

10  technical issues in terms of filing that document.

11  On the 25th, I attempted to file the document through

12  my ECF credentials.  It did not allow me to do so.  I

13  sent a copy to chambers to establish the fact that

14  the document was ready on time.  It was sent to

15  chambers.  Immediately the next morning, my team

16  reached out to your chambers and the ECF help desk,

17  and over the last two weeks, have had numerous

18  attempts to correct the issue and get the document

19  filed.

20          THE COURT:  So you're saying that you sent

21  a hard copy to chambers?

22          MR. ALTMAN:  I did not send --

23          THE COURT:  Oh.

24          MR. ALTMAN:  -- a hard copy to chambers,

25  Your Honor.  We -- I sent by email a copy to chambers

1   that day.  I put my team on it the next day in an

2   attempt to rectify the problem.  They spoke to the

3   ECF help desk.  They made numerous calls, which can

4   all be documented, to get this document filed.  This

5   was also the very time where I lost my left eye,

6   crashed during this time, and so dealing with severe

7   medical disabilities has affected that.

8           THE COURT:  But let me ask you the

9   technical aspect of it.  You said that on October

10  25th, you had difficulties filing through ECF so that

11  you reached out to my chambers and got some guidance,

12  and then sent us an email with a copy of the

13  response?

14          MR. ALTMAN:  Your Honor --

15          THE COURT:  Did I understand that?

16          MR. ALTMAN:  -- before I even spoke to your

17  chambers to establish that --

18          THE COURT:  Yes.

19          MR. ALTMAN:  -- we had the document

20  prepared on the 25th, as Your Honor ordered --

21          THE COURT:  Yes.

22          MR. ALTMAN:  -- I emailed a copy on the

23  25th to your chambers before I even spoke to anyone,

24  and to brother counsel, to establish that we had

25  prepared a response, we had submitted a response.

6

1   And I figured I would deal with the technical issues

2   the next morning.

3          The next morning, my team reached out to

4   your chambers to tell them what had happened.  They

5   also tried to contact the ECF help desk to see if we

6   could figure out why we couldn't get the document

7   filed.  They have made numerous, consistent attempts

8   since October the 25th to no avail.  For some reason,

9   we cannot seem to file anything.  I apologize if

10  maybe one of the alternatives would have been to

11  file -- to file a paper copy with the Court, but we

12  had believed that by emailing it to the Court and to

13  brother counsel and having advised chambers, that

14  that was adequate.

15         THE COURT:  And do you know or can you

16  identify in the help desk who attempted to help you

17  or not help you so that we can follow up on that?

18  That seems to be a real serious problem.

19         MR. ALTMAN:  Your Honor, I could not, but I

20  would be happy to provide, if Your Honor would

21  accept, a --

22         THE COURT:  Okay.

23         MR. ALTMAN:  When I get back I'll get with

24  my team to give me, you know, documentation --

25         THE COURT:  Now --

7

1          MR. ALTMAN:  -- of their efforts that I can

2    provide.

3          THE COURT:  -- Mr. Vance, do we know

4    anything about an email sent to our chambers on

5    October 25th?

6          COURTROOM DEPUTY:  I just went back and we

7    checked our chambers account and our email account.

8    We have no email from Mr. Altman.

9          THE COURT:  Okay.

10          MR. ALTMAN:  Your Honor, I know --

11          COURTROOM DEPUTY:  Other than -- other than

12    today's email.

13          THE COURT:  Today's email --

14          COURTROOM DEPUTY:  Today's email just --

15          THE COURT:  -- from your office telling us

16    about your accommodations.  That came yesterday I

17    think.

18          COURTROOM DEPUTY:  It might have been

19    yesterday.

20          THE COURT:  Yes.

21          MR. ALTMAN:  Your Honor, I will attest to

22    that --

23          THE COURT:  Yes.

24          MR. ALTMAN:  -- I sent this email on that

25    night.  I can try to track through, but --

8

1          THE COURT:  But it -- but since October

2    25th -- that's been two weeks -- we still haven't

3    received anything.

4          MR. ALTMAN:  My team has made consistent

5    efforts to do that, Your Honor.  I will -- I will --

6    if you would like me right now, I will call my team

7    and ask them to email it right this moment --

8          THE COURT:  No.  No, I don't --

9          MR. ALTMAN:  -- if you would like.

10          THE COURT:  -- think we need to do it right

11    now, but we certainly need to have some verification

12    from whoever is in your team as to these efforts

13    because in two weeks, you should have been able to

14    resolve this issue.

15          MR. ALTMAN:  I agree, Your Honor, and I

16    know that my team did it and I've been asking them

17    multiple times.  If you would give us until -- could

18    I have until Monday to get my team to --

19          THE COURT:  That would be fine.

20          MR. ALTMAN:  -- document their efforts for

21    you?

22          THE COURT:  Sure, that would be fine.

23          MR. ALTMAN:  Okay.  I will --

24          THE COURT:  Now --

25          MR. ALTMAN:  I will also have my team, as

1　soon as court concludes, just make sure that we email

2　a copy of the document.  And I apologize for not

3　bringing one here.  I did not realize you didn't have

4　one.  I apologize.

5　　　　　　THE COURT:  Do you have one for yourself

6　here?

7　　　　　　MR. ALTMAN:  I do not.  I couldn't -- Your

8　Honor, I have lost the ability to read.

9　　　　　　THE COURT:  Okay.  Okay.  So let's go

10　through the rule, failure to accurately certify that

11　the -- well, first of all, Mr. Altman, tell me who

12　you are and what is your relationship to this firm?

13　　　　　　MR. ALTMAN:  Okay.  My name is Keith

14　Altman.  I am the principal of the Law Office of

15　Keith Altman.  At the time the case was filed, I was

16　going to be entering into an of counsel relationship

17　with the Lento Law Group on a fairly systematic

18　basis.  We were going to work together, and maybe

19　more formally, I was going to join the firm.

20　Ultimately, we decided not to pursue that.  In any

21　event, the intention was that I would be lead counsel

22　on this matter after it had been filed.  Ms.

23　Feinstein would be the local counsel.  Under the

24　general direction of the Lento Law Group, I would

25　come in, be pro hac-ed into the matter, and I

1   would -- I would act as lead counsel in the matter,

2   which is what happened.

3           Addressing your concern over the addresses,

4   I suppose that in the -- it was March of this year

5   where we decided that we were not going to proceed

6   that kind of relationship with one another, and we

7   simply agreed that we would be joint counsel on this

8   particular matter, still with me filling in as lead

9   counsel on the matter in terms of working on the

10  case.  And I've worked with brother counsel.  He and

11  I have been in communication on this matter since.

12  So I have been the one really responsible after my

13  pro hac vice application was granted.  I was really

14  the on doing the work on the case.

15          THE COURT:  Have you spoken to the

16  plaintiff in this case?

17          MR. ALTMAN:  Yes.

18          THE COURT:  Okay.  That was after the

19  complaint was filed?

20          MR. ALTMAN:  Correct.

21          THE COURT:  Yes.  Okay.

22          MR. ALTMAN:  Correct, Your Honor.  And I'm

23  prepared to -- I'm prepared to address anything that

24  Your Honor has raised.  I know you don't have the

25  advantage of having our -- you know, our document,

1    but I am prepared to address any of your questions at

2    this time.

3              THE COURT:  Now, Ms. Feinstein, tell me

4    also about yourself and what's your connection to the

5    Lento Law Firm --

6              MS. FEINSTEIN:  Sure.

7              THE COURT:  -- or to Altman's law firm?

8              MS. FEINSTEIN:  Sure.  Oh, I'm sorry, Your

9    Honor.  My name is Dr. Joan Feinstein.  I'm a

10   clinical psychologist and an attorney, and I am

11   co-counsel on just a few cases with the Lento Law

12   Firm.

13             THE COURT:  Okay.  You're admitted in

14   Pennsylvania?

15             MS. FEINSTEIN:  I am.

16             THE COURT:  Okay.  And when you -- where is

17   your office?

18             MS. FEINSTEIN:  My office right now is out

19   of my home --

20             THE COURT:  Okay.

21             MS. FEINSTEIN:  -- since Covid.

22             THE COURT:  But what is your relationship

23   to the Lento Law Firm?

24             MS. FEINSTEIN:  I know Joe Lento for

25   several years and I'm co-counsel on a few cases with

1   him.  I consult on some cases.

2          THE COURT:  Mr. Lento, he's from New

3   Jersey, is that right, or --

4          MS. FEINSTEIN:  I believe he lives in

5   Narberth, Pennsylvania.

6          THE COURT:  Oh, in Pennsylvania.  Okay.

7   Now, does the Lento Law Firm, to your knowledge, have

8   a physical presence in Pennsylvania?

9          MS. FEINSTEIN:  They do.

10          THE COURT:  Okay.  Where are they located?

11          MS. FEINSTEIN:  1500 Walnut Street.

12          THE COURT:  Okay.

13          MS. FEINSTEIN:  And I believe it's suite

14   500.

15          THE COURT:  Okay.  Now, when did you enter

16   an appearance in this -- in this case?  Let's see.

17          (Pause in proceedings.)

18          THE COURT:  Let me see here.

19          MR. ALTMAN:  Your Honor, may I?

20          THE COURT:  Yes.

21          MR. ALTMAN:  I believe the case was filed

22   in late May or early June of 2020, and Ms. Fein --

23          THE COURT:  Yes?

24          MR. ALTMAN:  -- and Ms. Feinstein was

25   the -- when the original complaint was filed, Ms.

1    Feinstein was the attorney --

2            THE COURT:  Yes.

3            MR. ALTMAN:  -- of record, listing me as

4    pro hac vice to be applied for.

5            THE COURT:  Now, at that time, there had

6    been a case that had been dismissed by the Court, and

7    we have a relatedness rule.  And this case, which

8    would have been filed within the time that required

9    you to identify the case as related, that was not

10   done.

11           MS. FEINSTEIN:  You're talking about the

12   (indiscernible) --

13           THE COURT:  Yes, your -- this -- the

14   particular case here, which was identical to a prior

15   case that the Court had dismissed, was filed and it

16   should have been marked related and assigned to me.

17   Rather, it was not marked related, so it was assigned

18   to Judge Goldberg.  Judge Goldberg had referred the

19   matter to the magistrate judge, Judge Strawbridge,

20   and Judge Strawbridge, who discovered that these

21   cases were related.

22           MR. ALTMAN:  Your Honor, that's 100 percent

23   true.

24           THE COURT:  Okay.

25           MR. ALTMAN:  The problem -- here is the

14

1    issue and the explanation.  There was no intent to

2    evade Your Honor.  There was a change in personnel

3    which, frankly, was responsible for the case being

4    dismissed the first time, if you'll recall.  There

5    was a change in personnel.  Some eight months after

6    the case had been dismissed, had elapsed, the

7    personnel who were involved in refiling this case

8    were simply not involved in that other case.  It's

9    not that it was unknown to the firm itself the case

10   was being filed, but the individuals who were

11   involved in actually preparing and filing the instant

12   case were just unaware that it had been filed before.

13   There was absolutely no intent to evade this Court's

14   jurisdiction.  If that really was the attempt, there

15   were many things that could have been done.  They

16   could have waited the 12 months and filed it and

17   wouldn't have had to disclose it.  They could have

18   filed it somewhere else, in New Jersey because

19   there's a New Jersey connection.  But that isn't the

20   case.

21           In fact, Your Honor, I just learned

22   something I hadn't realized.  When the case was

23   refiled it was accidentally filed in the District of

24   New Jersey.  And instead of leaving it there, they

25   dismissed the case, got a refund, and refiled the

1    case here.  So there's simply -- this is a law office

2    mistake.  Both of the individuals who were involved

3    believed in good faith that this -- that when they

4    filled out those forms, that they were filling them

5    out accurately.  They were not accurate.  That is, in

6    fact, true.  But there was no -- there was no attempt

7    to evade Your Honor's jurisdiction.

8            THE COURT:  Now, the first time, the lawyer

9    who was here representing the plaintiff, candidly --

10   and it's a matter of public record -- testified or

11   stated to the Court that he had never met the

12   plaintiff and that he hadn't done any research other

13   than read the statute, so that when the case was

14   dismissed, one of the provisions for the dismissal

15   was that any subsequent complaint had to provide

16   authority that would make it a plausible claim under

17   <u>Twombly</u>.  And we had specifically the question of

18   whether there was any authority to hold a promoter

19   liable for the failure of the site to provide

20   accommodations consistent with the ADA.  That wasn't

21   done.

22           MR. ALTMAN:  Your Honor, that's also

23   correct.  Through the same lapse of time, that order

24   was just not made available to the people that are

25   involved, but I can tell you that in our response to

16

1    Your Honor's order, we did provide -- you know, one
2    of the bases is clearly there could be a contractual
3    basis between the -- contractual basis between the
4    promoter and the site, and we found that there is no
5    authority that says that you -- as a matter of law,
6    that a promoter is excluded from liability.  So while
7    absolutely Your Honor ordered that to be done,
8    unfortunately, through that same lapse of time and
9    change of personnel, that particular provision of an
10   order was not made available.  Had it been, of course
11   it would have been complied with.  But we do -- we
12   did in good faith believe that a promoter could be
13   held liable.  We did -- in response to your order,
14   which we will get to you, we did provide, you know,
15   the contractual basis and some case authority on why
16   they're not excluded as a matter of law.

17        I apologize for it not having been there in
18   the complaint as it should have been.  It would have
19   been somewhat unusual to do that, but if Your Honor
20   had ordered that to be done, clearly, we would have
21   done that.

22        THE COURT:  Well, that was ordered in light
23   of the fact that the first complaint did not provide
24   any support for that theory, and the lawyer had said
25   specifically that he had not done any research except

1 to look at the statute when we asked for any case

2 law, and he -- the counsel at that time also stated

3 that he had never met the plaintiff.

4         MR. ALTMAN:  Your Honor, I can't speak for

5 what --

6         THE COURT:  So, therefore, there was a

7 remedial order in order to protect the plaintiff, and

8 that order was not complied with.

9         MR. ALTMAN:  Your Honor, I apologize, it

10 was an eight-month delay between those two -- between

11 those two events, and there was a change of

12 personnel.  It clearly should have been complied

13 with.

14         THE COURT:  Okay.

15         MR. ALTMAN:  But we did -- but we do -- but

16 still I believed at the time, in reviewing the

17 complaint, there was a good faith basis for the

18 promoter having been in -- you know, good faith

19 doesn't mean I have to have a case law, but I believe

20 that absent discovery, seeing the contractual

21 relationship between the two individuals -- I mean,

22 clearly, there could have been a contractual

23 relationship and it might not even be unusual.  But

24 absolutely, it was not complied with.  It should have

25 been complied with.  Had I been aware of it -- had

1    any of the people who ultimately were involved in the

2    filing of the second complaint would have been --

3              THE COURT:  Okay.

4              MR. ALTMAN:  -- aware of it, it would have

5    been addressed.  I will say that the issue was raised

6    by Mr. Torres in front of Judge Goldberg, and Judge

7    Goldberg asked questions of me at that time, and

8    Judge Goldberg was satisfied with my response -- was

9    satisfied the response --

10             THE COURT:  Of course he was unaware of the

11   prior history of this case.

12             MR. ALTMAN:  I understand.  No, no, all I'm

13   saying is -- no, no, I don't mean it from the -- I

14   mean it from the merits perspective --

15             THE COURT:  Yes.

16             MR. ALTMAN:  -- that Judge Goldberg was

17   satisfied that my explanation of why there could be

18   liability was adequate on a merits basis.

19             THE COURT:  Now, when you appeared before

20   Judge Goldberg, did you bring to his attention the

21   prior history of the case?

22             MR. ALTMAN:  I did not, Your Honor.

23             THE COURT:  Okay.

24             MR. ALTMAN:  I did not, and he didn't -- he

25   didn't ask about it, and I didn't --

19

1        THE COURT:  Well, he wouldn't have known.

2        MR. ALTMAN:  I understand.  I appreciate

3   that.  I did not, Your Honor.  Well, actually, it did

4   come up, of course it did, because Mr. Torres raised

5   it.  So --

6        THE COURT:  Was that before Judge

7   Strawbridge or before Judge Goldberg?

8        MR. ALTMAN:  Before Judge Goldberg.

9        THE COURT:  Okay.

10       MR. ALTMAN:  Mr. Torres raised it.  He

11  raised the very issue that you're raising now about

12  there having to be something in there, and Judge

13  Goldberg inquired of me, Mr. Altman, what's your

14  basis for why he could be in this -- you know, he

15  should be in this complaint?  I don't think -- well,

16  obviously, Judge Goldberg knew about your order at

17  that time.  And, frankly, that was the first time I

18  had ever heard about your order.

19       THE COURT:  Yes.  Okay.  Now, so far, what

20  you have advanced, and apparently it's all written

21  out in your response, is that each of the grounds for

22  the rule to show cause is factually correct except

23  that you have an explanation for that, and,

24  generally, the explanation is administrative foul up,

25  an administrative issue, not a substantive issue but

20

1    an administrative issue.

2            MR. ALTMAN:  Yes.  Now, from my

3    perspective, Your Honor, I was never involved in the

4    administrative aspects of this case.

5            THE COURT:  Well, but you -- this is your

6    law firm.

7            MR. ALTMAN:  No, it's --

8            THE COURT:  I don't understand that, what

9    you mean by you weren't involved.

10            MR. ALTMAN:  No, no.  No, what I mean, Your

11    Honor, is the failure to identify the previous cases,

12    I had to --

13            THE COURT:  Right.

14            MR. ALTMAN:  -- acknowledge that that was

15    an issue because I was pro hac-ed into the case

16    subsequent to that.  So I was not -- I was never

17    supposed to be --

18            THE COURT:  So who was -- who was the --

19    oh, you mean the initial case?

20            MR. ALTMAN:  No, no, I'm not talking the

21    initial case.  What I'm talking about is Your

22    Honor -- part of the -- Your Honor has raised the

23    issue about --

24            THE COURT:  Yes.

25            MR. ALTMAN:  -- the case-tracking

1    situation.  I was never involved in those -- in those

2    forms being filled out, I never saw them, it was

3    never anything I was supposed to do.

4           THE COURT:  Well, who did that?

5           MR. ALTMAN:  That was done by the Lento

6    Law -- the Lento Law -- and it's the Lento Law Group,

7    to be precise.  That was done by Ms. Feinstein and,

8    you know, prepared -- documents prepared for her.  I

9    had never seen those documents.  I was never part of

10    the administration.  So I -- you know, the

11    administration of the case.  I was pro hac-ed into

12    the case after that took place.  So for me

13    personally, I had nothing to do with those forms

14    being filled out incorrectly.  I never saw them, I

15    never reviewed them, I was never part of that.  I was

16    simply pro hac-ed in subsequent to that point.

17           THE COURT:  Well, what's --

18           MR. ALTMAN:  And --

19           THE COURT:  What happened to the Lento

20    Firm?  That's -- Ms. Feinstein, you're identified in

21    the docket as being the Lento Law Group.

22           MR. ALTMAN:  Well, Your Honor, there

23    were -- there's the Lento Law Firm, which is a

24    separate entity from the Lento Law Group.  That's all

25    I'm trying to say.  They're two separate entities.

22

1  The Lento Law Group is what's involved in this

2  matter, not the Lento Law Firm.

3           THE COURT:  Well, let's see.

4           (Pause in proceedings.)

5           THE COURT:  Now, Judge Goldberg issued an

6  order, which is docket number 10, requiring a

7  licensed attorney to enter an appearance.  And now,

8  that had to do with the defendant.  Mr. Griffin, is

9  that -- is that what was going on there?

10          MR. GRIFFIN:  Your Honor, that had to do

11  with the defendant --

12          THE COURT:  Oh.

13          MR. GRIFFIN:  -- Alex Torres, that --

14          THE COURT:  Yes.

15          MR. GRIFFIN:  -- was eventually defaulted

16  in the case.

17          THE COURT:  Right.  Right, because he's not

18  an attorney who was representing a corporation.

19          MR. GRIFFIN:  But I had received a number

20  of calls -- and I cannot recall his name -- from an

21  attorney in Florida saying that he wanted to enter

22  his appearance and could I support him on a pro hac

23  vice basis.  I did some research on that and we

24  concluded that because I might potentially

25  counterclaim on him or something, that would not be

1    appropriate, but I told him I would make all efforts

2    to find someone to get him in.

3              I called a number of my colleagues.  As

4    Your Honor knows, I've appeared to you before to do

5    primarily criminal work, and had some names.  And

6    their position was sure, just compensate our time to

7    appropriately get him in pro hac vice, and that

8    attorney did not want to spend any money to do that.

9    And I said look, I can't -- I can't be of any further

10   help than I've already been.

11             THE COURT:  Yes.

12             MR. GRIFFIN:  So Mr. Torres has remained

13   unrepresented with a default judgment --

14             THE COURT:  Well, not a judgment, just a

15   default.

16             MR. GRIFFIN:  Default.

17             THE COURT:  Yes.

18             MR. GRIFFIN:  -- with a default against

19   him.

20             THE COURT:  Okay.

21             MR. ALTMAN:  Which we were -- which we were

22   forced to do, Your Honor, and, clearly, we would

23   vacate to give Mr. Torres an opportunity to -- Alex

24   Torres Productions, to get representations.  I

25   believe the Court just --

24

1          THE COURT:  Well, now, let me ask again --
2  let me ask -- let me ask Ms. Feinstein and let her
3  speak for herself, you are on the docket as being
4  associated or in some fashion connected with the
5  Lento Law Group, P.C., is that accurate?
6          MS. FEINSTEIN:  Yes.
7          THE COURT:  Okay.  That's at 1500 Market
8  Street?
9          MS. FEINSTEIN:  I think --
10          THE COURT:  You said Walnut Street before.
11          MS. FEINSTEIN:  I thought it was Walnut
12  Street.
13          MR. ALTMAN:  It is Walnut Street.
14          THE COURT:  Okay.
15          MS. FEINSTEIN:  It's Walnut Street, Your
16  Honor.
17          THE COURT:  It's 12ᵗʰ Floor, East Tower, so
18  it sounds like Market Street.
19          MS. FEINSTEIN:  I think it moved to 1500
20  Walnut Street, Suite 500.
21          THE COURT:  Well, there is a 1500 Walnut,
22  but it doesn't have an east tower.
23          MS. FEINSTEIN:  Okay.
24          THE COURT:  And it's -- so --
25          MR. ALTMAN:  Your Honor, I think they may

25

1   have moved in the lapse of time between those 18

2   months.

3            THE COURT:  Okay.

4            MR. ALTMAN:  The firm currently is at --

5            THE COURT:  So they moved to 1500 Walnut

6   Street?

7            MR. ALTMAN:  Correct.  We were there today,

8   so I can tell you with 100 percent assurance.  I sat

9   in that office today.

10           THE COURT:  Okay.

11           MR. ALTMAN:  And Ms. Feinstein is -- you

12   know, who is the counsel of record, is also --

13           THE COURT:  So --

14           MR. ALTMAN:  -- located in Pennsylvania.

15           THE COURT:  -- tell me about your

16   association with this -- with this case.  What -- how

17   did that come about?

18           MS. FEINSTEIN:  As I said, I consult -- I'm

19   co-counsel on just a few cases with --

20           THE COURT:  Yes.

21           MS. FEINSTEIN:  -- the Lento Law Firm, and

22   Mr. Lento had told me about the case.  I am a

23   psychologist interested in disability, and he --

24           THE COURT:  Yes.

25           MS. FEINSTEIN:  -- told me about the case

26

1  and asked if I would be involved in the case.  I

2  would have a minimal role, and they would bring in

3  another attorney at some point.

4           THE COURT:  They would what?

5           MS. FEINSTEIN:  Bring in another attorney.

6           THE COURT:  Okay.  Okay, but you signed the

7  pleading in the original complaint.

8           MS. FEINSTEIN:  I did.

9           THE COURT:  Now, had you -- had you met Mr.

10  Rosario?

11           MS. FEINSTEIN:  I had not.

12           THE COURT:  Okay.  Well, what do you think

13  of that?  Do you think that's appropriate?

14           MS. FEINSTEIN:  I relied on the firm's

15  judgment.  At that time, Your Honor -- I'm a breast

16  cancer patient and it was during Covid, and --

17           THE COURT:  Yes.

18           MS. FEINSTEIN:  -- I was restricted from

19  meeting people in person.

20           THE COURT:  Yes.

21           MS. FEINSTEIN:  So there was a lot going on

22  during that time.

23           THE COURT:  But you wouldn't do it again?

24           MS. FEINSTEIN:  I would never do it again,

25  Your Honor.

1          THE COURT:  Yes.  Okay.

2          MS. FEINSTEIN:  I'd go by the advice of my

3    oncologist and make that right from the beginning and

4    would never do that again.

5          MR. ALTMAN:  Your Honor, if I -- if I might

6    add, the firm itself though had met with Mr. Rosario

7    and had numerous discussions with Mr. Rosario.  So it

8    is -- while Ms. Feinstein may not have personally met

9    with him, the firm had met with him on multiple

10   occasions, multiple discussions, but the complaint

11   was drafted based upon conversations with Mr.

12   Rosario.

13         THE COURT:  Well, that may be so, but it's

14   not on the docket, and it's her signature which

15   certifies the compliance with Rule 11 and the

16   compliance with the rules.  So it's pretty relevant

17   that somebody else had met with him.  The question is

18   you put her signature and her license behind this

19   complaint and she has to stand behind it.

20         MR. ALTMAN:  Your Honor, I think that she

21   could -- it seems to me that she could reasonably

22   rely upon --

23         THE COURT:  Well, why don't you let her

24   speak for herself?  She's --

25         MR. ALTMAN:  Okay.

28

1          THE COURT:  She's a lawyer.

2          MR. ALTMAN:  I'm sorry, Your Honor.

3          THE COURT:  Okay?  Now, you yourself are

4   identified here as being in the Lento Law Group, but

5   you claim you're not?

6          MS. FEINSTEIN:  I'm no longer there.

7          THE COURT:  Okay.

8          MS. FEINSTEIN:  At that time, Your Honor --

9          THE COURT:  Yes.

10          MS. FEINSTEIN:  -- I was thinking about

11   more of an association with them, but due to my

12   health issues --

13          THE COURT:  Sure.

14          MS. FEINSTEIN:  -- it's not appropriate,

15   and I would --

16          THE COURT:  Okay.

17          MS. FEINSTEIN:  -- never do --

18          THE COURT:  So you're going to -- are you

19   going to withdraw from this case or are you going to

20   continue?

21          MS. FEINSTEIN:  I was going to ask them

22   to -- after speaking with my physicians, to ask them

23   to find substitute counsel.

24          THE COURT:  And you would like to withdraw

25   here?

29

1          MS. FEINSTEIN:  I would, Your Honor.

2          THE COURT:  Okay.  Certainly if your health

3    doesn't allow you to fully commit, I think that would

4    be a -- that would be a good thing to do.

5          MS. FEINSTEIN:  Honestly, Your Honor, Dr.

6    Fox, my hematologist/oncologist, did not want me to

7    come today, but I know -- I wanted to --

8          THE COURT:  Yes.

9          MS. FEINSTEIN:  -- come.  I didn't want to

10   disappoint the Court.

11         THE COURT:  I appreciate that.

12         MS. FEINSTEIN:  You're welcome.

13         THE COURT:  Okay.  Well -- now, is -- so

14   maybe it's the Lento Law Group that has answers to

15   these questions.

16         MR. ALTMAN:  Your Honor, I have -- I have

17   spoken to all people that I could to try to

18   understand where the failure took place, and I was

19   unable to identify -- I am not questioning that the

20   firm knew -- the firm itself, somebody knew the case

21   was being refiled, but somehow that message did not

22   get to the people who actually executed it months

23   later.

24         THE COURT:  Yes.

25         MR. ALTMAN:  I don't have an explanation to

1    how it happened, why it happened, and who was

2    responsible.  It was certainly not an attempt to

3    evade Your Honor's jurisdiction by having this case

4    come back before Your Honor.

5            THE COURT:  Yes.

6            MR. ALTMAN:  That I can tell you because,

7    once again, had they wanted to do that, there were

8    many other ways of doing that.

9            THE COURT:  Well, I mean it's like getting

10   caught robbing a bank.  You could say there would

11   have been other ways that I could have robbed this

12   bank and look how stupid I was by doing it this way.

13           MR. ALTMAN:  I under --

14           THE COURT:  So --

15           MR. ALTMAN:  I understand, Your Honor.

16           THE COURT:  Also, you have to understand

17   that because you have a staff and you have people

18   that support you, you are responsible for their

19   conduct.  You can't evade responsibility by saying

20   yes, I asked them to do that.  The captain of the

21   ship is responsible for what happens there, and

22   you're responsible for all these matters.  Either you

23   straighten out the office or do something about it,

24   but you can't just shift the blame to other people

25   and say well, gee, I didn't know that -- I told them

1   what to do, they didn't do it the right way.  You

2   know, this is a -- you know, there's a real problem

3   here and it is really a bunch of excuses that I hear

4   now.  And the real question is what would be a fair

5   and appropriate way of disposing of this matter?  I

6   think there is no question at all that serious

7   violations of both our local rules and perhaps the

8   Rules of Professional Conduct were implicated in this

9   case.  I don't think there's any question about that.

10  What should be a fair disposition and ensure that Mr.

11  Rosario is protected?  I don't see him involved in

12  any of this.  This all seems to be lawyer stuff.  So

13  he should be protected.  But I'm pretty troubled that

14  no one seems to stand up here and, you know, take

15  responsibility and take charge.  Maybe this Lento

16  Firm may be the one.  I don't know.

17          MR. ALTMAN:  Your Honor --

18          THE COURT:  Who is going to be -- who is

19  going to be counsel of record?

20          MR. ALTMAN:  Okay.  Your Honor, to address

21  your concerns, the Lento Law Group will find somebody

22  to substitute in Ms. Feinstein -- for Ms. Feinstein.

23          THE COURT:  Yes.

24          MR. ALTMAN:  That will take care of that

25  issue.  I have still been the primary counsel, and

1   brother counsel and I have had a good rapport and a

2   good working relationship, and, frankly, this matter

3   probably can be -- can be resolved.  We were in the

4   middle of -- we were in the middle of a mediation

5   when this all came to light.

6           THE COURT:  Yes.

7           MR. ALTMAN:  And I think the -- you know,

8   the posture to this point could be done.

9           In terms of responsibility, Your Honor,

10  it's not that somebody is passing the buck.  It's

11  just that I don't have an -- clearly, the firm is

12  responsible for not communicating to the people that

13  had to execute.

14          THE COURT:  You mean your firm?

15          MR. ALTMAN:  Not my firm.  I didn't have

16  anything to do with that.

17          THE COURT:  Okay.  So it's the Lento Firm?

18          MR. ALTMAN:  It's the -- it's the Lento

19  Firm.  I was not involved.  I had no knowledge about

20  Your Honor's order.  I had no knowledge --

21          THE COURT:  Okay.

22          MR. ALTMAN:  I did not see the form.  I had

23  nothing to do with the form.  I was pro hac-ed in

24  afterwards, so I'm not part of that.  But I'm here to

25  speak -- but I'm here to speak for the firm.  The

1 question is, Your Honor -- it's not whether there's

2 responsibility here, because there is.  The question

3 is what has the Lento Firm done to try to fix the

4 problem?  You know, it's not so much from the bottom

5 up.  There appears to be a violation here; therefore,

6 there must be punishment.  It's the question of there

7 appears to be something went wrong here.  What went

8 wrong, how do we fix it, and what can we do to keep

9 it from happening the next time?

10    THE COURT:  Yes.

11    MR. ALTMAN:  Now, clearly, the change of

12 personnel, that creates trouble for any firm.  It's

13 not an excuse, but it is a reality.

14    THE COURT:  Yes.

15    MR. ALTMAN:  Okay?  And all the firm can do

16 is put the best personnel in there, to train the best

17 personnel, to bring them up, to have reasonable --

18 you know, to try to take reasonable steps to see that

19 mistakes don't happen.  Can't always succeed, but

20 that's the goal.  And I can tell you that the Lento

21 Firm has improved its policies and procedures to try

22 to keep this kind of thing from happening going --

23    THE COURT:  Well, let me ask you this.  Are

24 you here speaking for the Lento Firm or are you here

25 speaking for yourself?

34

1          MR. ALTMAN:  I'm speaking for both.

2          THE COURT:  Okay.

3          MR. ALTMAN:  Mr. Lento asked me to --

4  because I -- you know, Mr. Lento asked me to

5  investigate --

6          THE COURT:  Okay.

7          MR. ALTMAN:  -- what had happened and to

8  try to -- to try to be able to explain to the Court

9  what had happened here.

10          THE COURT:  Yes.

11          MR. ALTMAN:  And I've told you everything

12  that I know --

13          THE COURT:  Okay.

14          MR. ALTMAN:  -- after a rather exhaustive,

15  you know -- rather exhaustive inquiry into what

16  happened here.  From my perspective, at least with --

17  from my perspective, you know, I don't think I have

18  any liability here because I wasn't part of the --

19  you know, what has caused the Court the problem.  I

20  was never supposed to be part of the administration,

21  I was to be pro hac-ed in afterwards which happened,

22  I had no knowledge -- until Your Honor pointed out at

23  that hearing the second form, which was the tracking

24  form, I had no knowledge that that form had ever even

25  existed.

1          THE COURT:  Yes.

2          MR. ALTMAN:  That was the first time I saw

3   it, and as soon as Your Honor pointed it out, I

4   realized this is a problem.  And I recognized that,

5   and immediately I went to try to figure out what had

6   happened.

7          THE COURT:  Yes.

8          MR. ALTMAN:  And I spoke to everybody I

9   could speak to about what had happened.  So I --

10  there's not excuses here, Your Honor.  I'm trying to

11  explain in kind of a somewhat clinical scientific

12  manner what might have happened here and how there

13  was a failure.  In terms of how Your Honor should

14  deal with it, I'm not saying that there shouldn't be

15  some accountability, but there's a difference between

16  accountability and improvement and punishment.

17         THE COURT:  Yes.

18         MR. ALTMAN:  I think that there is no

19  evidence that what took place here was an attempt to

20  evade Your Honor's jurisdiction.  We could have -- I

21  just -- there is no evidence of that.  I mean you

22  could say yes, it's a possibility, but it just

23  wasn't.  I wasn't concerned -- had I known about your

24  order in terms of putting information in the

25  complaint about the promoter liability, we would have

 1   done it.  I believe that in a good faith -- there was

 2   a good faith basis for bringing that.

 3           THE COURT:  Yes.

 4           MR. ALTMAN:  I can't speak for what Mr.

 5   Feinstein said when he didn't -- you know, when he

 6   was originally involved in the case, but I can tell

 7   you, you know, I reviewed the complaint, I believe in

 8   good faith that Mr. -- you know, that Torres

 9   Productions can have liability here.  I stand -- I

10   stand behind that.  We've provided that in our

11   response.  So --

12           THE COURT:  You told me -- I think you

13   might have already answered this question, but you

14   met with Mr. Rosario --

15           MR. ALTMAN:  I did not meet --

16           THE COURT:  -- before you came into the

17   case?

18           MR. ALTMAN:  I did not meet with him, but I

19   spoke with him and I had seen his interview notes.  I

20   know the firm met with him long before I ever got

21   involved, before the complaint was drafted.  At some

22   point, I know I saw his interview notes, okay?  I was

23   familiar with what happened based on -- based on that

24   note-taking, the complaint.

25           THE COURT:  Now, has Mr. Rosario authorized

1    your firm to represent him?

2              MR. ALTMAN:  Yes.

3              THE COURT:  Okay.

4              MR. ALTMAN:  And I specifically -- you

5    know, specifically spoke with Mr. Rosario.  I

6    didn't -- and he is -- you know, I've specifically

7    spoken with Mr. Rosario about his case.

8              THE COURT:  You mean on the telephone?

9              MR. ALTMAN:  Yes.

10             THE COURT:  Okay.

11             MR. ALTMAN:  I physically am in Michigan,

12   Your Honor.

13             THE COURT:  Yes.

14             MR. ALTMAN:  Mr. Rosario is disabled,

15   obviously, and he is in New Jersey.

16             THE COURT:  Now, Mr. Griffin, we -- Mr.

17   Altman referred to some mediation that was going on?

18             MR. GRIFFIN:  Through Judge Strawbridge.

19             THE COURT:  Oh, okay.

20             MR. GRIFFIN:  Yes.

21             THE COURT:  For the -- okay.

22             MR. GRIFFIN:  There was mediation that was

23   going on.  There were conversations between Judge

24   Strawbridge and just myself, Judge Strawbridge and

25   just Mr. Altman by himself, and there seemed to be an

38

1   active discussion, but then this issue was discovered

2   by --

3            THE COURT:  But Mr. --

4            MR. GRIFFIN:  -- Judge Strawbridge.

5            THE COURT:  -- Torres, what about him?  Was

6   he involved in this?

7            MR. GRIFFIN:  I can't say that.  I would

8   tend to think that there were no conversations

9   between Judge Strawbridge and Mr. Torres because

10  there had always been, to my understanding, an

11  existing order in place that he had to have counsel

12  because --

13           THE COURT:  Yes.

14           MR. GRIFFIN:  -- I believe, in part, he was

15  part of an incorporation.

16           THE COURT:  Sure, yes.

17           MR. GRIFFIN:  So I do not believe that

18  there were any conversations that ever occurred

19  between Judge Strawbridge and --

20           THE COURT:  Yes.

21           MR. GRIFFIN:  -- Mr. Torres directly.  I

22  don't know that.

23           THE COURT:  Because it would --

24           MR. GRIFFIN:  I would guess that.

25           THE COURT:  It would appear to me that if

39

1   there were to be a settlement in this case, whoever

2   the lawyer is, it would have to involve Mr. Torres

3   because Mr. Torres would have a cross-claim against

4   the restaurant if he's found liable for the

5   violation.  So --

6           MR. GRIFFIN:  I would -- I would think

7   you're correct.

8           THE COURT:  Yes.

9           MR. GRIFFIN:  And the fact that he is

10  currently in a default position, so he's -- you know,

11  he's behind the eight ball --

12          THE COURT:  Yes.

13          MR. GRIFFIN:  -- so to speak, already.

14          THE COURT:  Okay.  Okay.  Well, let's think

15  about this.  Is there anything else, Mr. Altman, that

16  you would like to add to the record today?

17          MR. ALTMAN:  Your Honor, I'd just ask that

18  in deciding what to do here, you focus on the -- that

19  the parties that are involved here acted in good

20  faith, even if erroneously, that I believe the proper

21  accountability here is to remedial in nature in terms

22  of making sure the procedures and policies do the

23  right job in terms of preventing this kind of

24  situation from happening again, and that the Court

25  focus on that is -- would serve better justice

1   overall not just for -- not just for Mr. Rosario and

2   the defendants, but that it would -- it would further

3   justice for, you know, other clients who will be the

4   beneficiary of better policies and procedures, and

5   that the Court -- you know, the Court consider that

6   as being the appropriate what to do here and believe

7   the parties involved that this was not -- certainly

8   this was not -- there was no intent here to deceive

9   the Court, to deceive anyone, even though that there

10  are mistakes that have been made here.

11          THE COURT:  Yes.  And as I understand it,

12  these occurred after -- these had occurred before you

13  came into the case, and, therefore, that was the

14  Lento Firm's dealing?

15          MR. ALTMAN:  That is -- that is -- you

16  know, that is true as a (indiscernible) perspective.

17  I had no knowledge.

18          THE COURT:  Except for the October 25th

19  matter, which, of course, that was your issue?

20          MR. ALTMAN:  Correct, Your Honor.

21          THE COURT:  Yes.

22          MR. ALTMAN:  And I apologize and --

23          THE COURT:  Yes.

24          MR. ALTMAN:  -- I am sorry.  You know, my

25  medical condition -- you know, that -- frankly, when

41

1   my eyesight in my one remaining eye crashed and --

2             THE COURT:  But that -- I thought that

3   was --

4             MR. ALTMAN:  I'm not -- I'm not trying to

5   make excuses.

6             THE COURT:  That was technical.  That -- in

7   other words, the response was there, you just

8   couldn't get it here?

9             MR. ALTMAN:  I couldn't -- Your Honor, I

10  struggled just to be able to see the screen to try to

11  file the response.

12            THE COURT:  Okay.

13            MR. ALTMAN:  It was an incredible struggle.

14            THE COURT:  So --

15            MR. GRIFFIN:  Judge, if I could just add

16  one thing?  The fact that Mr. Vance checked and there

17  was nothing in your system, I can represent I

18  received it.  I don't have it in front of me, but

19  there was an email that was sent, I was copied on.

20  It was to your chambers.  It's possible that the

21  email for your chambers was incorrect.  I did not

22  check it.  But I can represent that I did receive a

23  copy of it in an email that went out directed to Your

24  Honor.  So the fact that it's not anywhere in your

25  email system, maybe it was an incorrect address for

42

1    you.  But I can represent that I did receive it on

2    the day in question --

3                    THE COURT:  Yes.

4                    MR. GRIFFIN:  -- in an email that

5    essentially explained, Your Honor, Keith Altman here,

6    I tried to file it, I'm having trouble, I wanted to

7    make sure you had a copy.  So in all fairness, that

8    is making that part of their whole.

9                    THE COURT:  Okay.

10                   MR. GRIFFIN:  So maybe it never got to you

11   because the email address that he sent it to was

12   incorrect.  I don't know that.  I can only say I got

13   it and I got it on the day in question.

14                   THE COURT:  Yes.

15                   MR. ALTMAN:  Your Honor, literally, I was

16   limited to trying to use this to type, so --

17                   THE COURT:  Well, okay.

18                   MR. ALTMAN:  -- it's entirely possible I

19   mistyped Your Honor's email address.

20                   THE COURT:  Okay.  Very well.  We'll take

21   the matter under advisement and we'll get back to

22   you.  Thank you.

23                   MR. ALTMAN:  Thank you, Your Honor.

24                   MS. FEINSTEIN:  Thank you, Your Honor.

25                   MR. GRIFFIN:  Thank you, Your Honor.

43

1          THE COURT:  All right.

2          MR. ALTMAN:  Just to be clear, I'll get you

3   Monday the -- kind of the log of our efforts?

4          THE COURT:  Please do so.

5          MR. ALTMAN:  Okay.  And I'll have my team

6   send the document to chambers immediately, is that

7   okay?

8          THE COURT:  That would be fine.

9          MR. ALTMAN:  Thank you, Your Honor.

10         MS. FEINSTEIN:  Thank you, Your Honor.

11         (Proceedings adjourned, 2:50 p.m.)

12

13                    *  *  *

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6                          CERTIFICATION

7

8            I, Michael Keating, do hereby certify that

9    the foregoing is a true and correct transcript from the

10   electronic sound recordings of the proceedings in the

11   above-captioned matter.

12

13

14        11/15/21

15   _____          _____

16   Date                      Michael Keating

17

18

19

20

21

22

23

24

25